AO 91 (Rev. 11/82)     **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA | |
|---|---|---|
| UNITED STATES OF AMERICA<br>v.<br>LEONARD DIZON SERRANO | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>18MJ00257 | |

Complaint for violation of Title 18, United States Code, Section 1704

| NAME OF MAGISTRATE JUDGE<br>HONORABLE SUZANNE H. SEGAL | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>February 1, 2018 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE

[18 U.S.C. § 1704]

On or about February 1, 2018, in Los Angeles County, within the Central District of California, defendant LEONARD DIZON SERRANO knowingly possessed with the intent to unlawfully and improperly use, and to cause the same to be unlawfully and improperly used, a key suited to locks adopted and in use at the time by the United States Post Office Department and Postal Service, and to any authorized receptacle for the deposit and delivery of mail matter, namely, one counterfeit Postal Service "arrow" key.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**JAMES M. KEENAN** |
|---|---|
| | OFFICIAL TITLE<br>U.S. Postal Inspector, United States Postal Inspection Service |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE<br>SUZANNE H. SEGAL | DATE<br>February 2, 2018 |
|---|---|

AUSA Lindsay M. Bailey ext. 6875   REC: Detention

## AFFIDAVIT

I, James Keenan, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against LEONARD DIZON SERRANO ("SERRANO") for Possession of a Counterfeit Postal Arrow Key in violation of 18 U.S.C. § 1704.

2. This affidavit is also made in support of a search warrant for a Samsung cell phone bearing model# SM-S550TL and IMEI: 359578071923017 (the "SUBJECT DEVICE") seized incident to SERRANO's arrest on or about February 1, 2018, as described more fully in Attachment A, which is incorporated by reference. The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1704 (Possession of a Counterfeit or Unauthorized Postal Key), 18 U.S.C. § 1708 (Mail Theft and Possession of Stolen Mail), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1349 (Bank Fraud Conspiracy); 18 U.S.C. § 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 18 U.S.C. § 1029 (Access Device Fraud), and 18 U.S.C. § 1028A (Aggravated Identity Theft) (collectively, the "Target Offenses") as described further in Attachment B, which is also incorporated by reference.

### II. BACKGROUND FOR POSTAL INSPECTOR JAMES KEENAN

3. I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since

1

June 2015.  I am currently assigned to the Los Angeles Division Mail Theft Team, which investigates crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of United States mail, fraud, and related activity in connection with access devices (including credit and debit cards), identity theft, and unauthorized use of personal identifying information.  I completed a twelve-week basic training course in Potomac, Maryland.  That course included training in the investigation of identity theft via the United States Mail.  Before becoming a Postal Inspector, I worked as a Customs and Border Protection Officer at the San Ysidro Port of Entry for approximately three years.  I also completed a six-month basic training course at the Federal Law Enforcement Training Center.  Based on my discussions with other Postal Inspectors, I have learned additional information about mail theft investigations and common mail theft and identity theft practices, as well as the use of digital devices in committing related crimes.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from Officers with the Los Angeles Police Department ("LAPD").  This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

5. On or about February 1, 2018, LAPD officers encountered SERRANO while SERRANO was engaged in a dispute with his apartment manager following SERRANO's eviction. LAPD Officer Oliver asked SERRANO if he had identification, to which SERRANO replied that he did not. Officer Oliver asked SERRANO for consent to look through SERRANO's backpack for documents which may contain his name, and SERRANO agreed. While looking through SERRANO's backpack, Officer Oliver discovered a methamphetamine pipe containing a white crystalline residue. Officer Oliver therefore arrested SERRANO for possession of narcotics paraphernalia. In searching SERRANO's person and backpack incident to arrest, officers also discovered a counterfeit postal arrow key, checks, credit cards and other mail matter that did not bear his name or address, as well as the SUBJECT DEVICE.

### IV. STATEMENT OF PROBABLE CAUSE

A.  Information Obtained from a Cooperating Defendant

6. Based on my personal investigation into this matter, as well as my conversations with a cooperating defendant, I am aware of the following:

   a. On or about Tuesday, January 30, 2018, I received information from a cooperating defendant that "Andy Serrano" (later identified as SERRANO) was also participating in mail/identity theft. According to the cooperating defendant,

3

mail thieves in the area would steal mail using counterfeit arrow keys and bring any checks received to SERRANO. SERRANO would then wash the checks in his home. The cooperating defendant also stated that SERRANO kept stolen credit cards at his home, located in the back of a multi-apartment complex at 607 North Saint Andrews Place. The cooperating defendant said that SERRANO's apartment was on the right side in the back of the complex with security cameras set up to monitor the surrounding area. The cooperating defendant identified SERRANO's home on Google Maps and showed me to two Facebook profiles for "Andy Serrano" which both appeared to depict SERRANO in the profile pictures.

  b. The same day, I researched the address of 607 North Saint Andrews Place North in Los Angeles using law enforcement databases which identified a potential occupant as SERRANO. However, SERRANO was listed as a resident as of June 27, 2016, and the dates of birth on file did not match to any other known records, leading me to believe "Andy" may not be SERRANO's true and correct name. I subsequently provided this information to LAPD Officers Oliver and Castaneda.

 **B. Arrest of SERRANO on February 1, 2018**

  7. From my review of LAPD Investigative Action/Statement Form for Incident# 18-0201001842, my conversations with Officer Castaneda and Oliver, and my personal observations, I am aware of the following:

  a. On or about February 1, 2018 at approximately 10:30 AM, Officers Castaneda and Oliver were patrolling the area

4

of 607 North Saint Andrews Place, Los Angeles. Officers Castaneda and Oliver were patrolling the area both because of the information I provided to them regarding SERRANO and because the area experienced frequent thefts and drug-related crimes.

      b. Los Angeles County Sheriff's Deputies advised Officers Castaneda and Oliver of an eviction occurring at 607 North Saint Andrews Place. Because they were aware that SERRANO lived at this residence based on information provided by the cooperating defendant, Officers Castaneda and Oliver walked to SERRANO's apartment at the back of the complex and saw what appeared to be the apartment manager arguing with a tenant, later identified as SERRANO. Officers Castaneda and Oliver entered the residence to speak with SERRANO briefly and then exited the apartment with him.

      c. Upon exiting the apartment, Officer Oliver asked SERRANO if he could conduct a quick search of his person to ensure he did not have any weapons on him. SERRANO agreed, and Officer Oliver did not find any weapons on SERRANO during the search. Officer Oliver then asked SERRANO if he had any identification on him. SERRANO replied that he did not. Officer Oliver then asked if SERRANO may have anything with his name on it inside his backpack. SERRANO replied "yes" and then gave Officer Oliver consent to look in the backpack for identification.

      d. Officer Oliver opened a small zipper portion of SERRANO's backpack and saw a clear glass pipe with a bulbous end containing an off-white crystalline substance resembling

5

methamphetamine. Officers Castaneda and Oliver then arrested SERRANO for Possession of Narcotics Paraphernalia in violation of the California Health and Safety Code Section 11364.1.

    e. Incident to SERRANO's arrest, Officer Oliver searched SERRANO's backpack and found a wallet containing identifications and credit cards in names other than SERRANO. Officer Oliver also found a counterfeit postal arrow key,[1] bank statements, mail matter, and checks in various names other than SERRANO. Officer Oliver then searched SERRANO's person and recovered a black wallet which contained additional credit cards in names other than SERRANO as well as the SUBJECT DEVICE.

    C. **Mirandized Interview of SERRANO**

    8. That same day at approximately 12:23 PM, I responded to the LAPD Hollywood Station and met with Officers Oliver and Castaneda. I reviewed the evidence recovered from SERRANO and noticed several checks and credit cards which appeared to have been washed and/or altered. I also saw a U.S. Treasury Check in the amount of $20,000 for an account ending in 041017 where the payee name and address also appeared to be washed and altered.

    a. At approximately 1:31 PM I provided SERRANO with a *"USPIS Warning and Waiver of Rights"* form which advised SERRANO of his Miranda rights. SERRANO waived his rights and agreed to speak to me. During the interview, SERRANO confirmed he has been living in Apartment #1 of 607 North Saint Andrews

---

[1] USPS arrow keys are specialized keys used by USPS mail carriers that can open arrow locks, allowing USPS mail carriers to (i) gain access to housing complexes or apartment buildings, and (ii) deliver mail to the respective mailboxes found therein.

Place, Los Angeles for approximately three years. SERRANO admitted he would provide shelter and food to members of his "circulation" and that in exchange people would bring him checks to wash. SERRANO said his friend A.S. was recently arrested by Postal Inspectors for mail theft and charged federally and that A.S. would steal lots of mail and bring it to him. SERRANO said he never personally stole mail. SERRANO said the counterfeit postal arrow key was his friend's and that SERRANO never used it. SERRANO admitted to using several of the credit cards to make purchases. Finally, SERRANO said that the Samsung cell phone recovered incident to arrest (the SUBJECT DEVICE) belonged to him and showed us his social media profiles already opened on the phone. SERRANO also consented to a search of the SUBJECT DEVICE.

   b. SERRANO consented to a search of his residence. When asked during the interview what Officers would find at the location, SERRANO admitted Officers would find mail that other people had brought him. He also said there would be washed checks and brake fluid, which he used to wash the checks.

## V. TRAINING AND EXPERIENCE REGARDING MAIL THEFT INVESTIGATIONS

  9. From my training and experience, including being a member of a USPIS Mail Theft Team, and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

   a. Persons who steal mail are often involved in fraud and identity theft crimes. These individuals usually steal mail looking for checks, access devices and personal

7

identifying information that they can use to fraudulently obtain money and items of value. It is common practice for individuals involved in mail theft, access device fraud, and identity theft to use and maintain digital devices. These individuals use such devices to store information about their identity theft crimes during and long after the crimes have been committed. This information can include: logs of fraudulent transaction history; records of funds received; information regarding individuals and companies that have been victimized; records of payments from co-conspirators; and victim profiles. Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

        b.    Mail and identity thieves oftentimes use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically on the internet. These individuals employ digital devices for purposes of, among other things, (i) applying online for fraudulent credit cards, (ii) obtaining personal identification information for the purposes of establishing or modifying fraudulent credit card accounts, (iii) using fraudulently obtained credit cards to make purchases, (iv) manufacturing counterfeit identification, credit cards, and checks, and (v) keeping records of their crimes.

c.  Based on my training and experience, I know that individuals who participate in these schemes often work with co-conspirators to steal mail, and to collect and use personal identifying and account information of their victims.  These individuals often communicate by phone, e-mail, text message, and social media, sometimes exchanging information and photographs related to their crimes.

### VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

10.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased,

compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

    c. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

    d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or

---

[2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

10

recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

        e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has

been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

    f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the

absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

   g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime. In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

11. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

12. For the foregoing reasons, I submit that there is probable cause to believe that SERRANO committed a violation of Title 18, United States Code, Section 1704 (Possession of a Counterfeit Postal Arrow Key). Based on the foregoing facts, I believe there is also probable cause to believe the items listed in Attachment B, which constitutes evidence, fruits, and instrumentalities of violations of the Target Offenses described above will be found on the iPad described in Attachment A.

JAMES KEENAN
United States Postal
Inspector, United States
Postal Inspection Service

Subscribed to and sworn before me this ____ day of February 2018.

HONORABLE SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE